**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CECIL E. KRUEL,                         )
                                        )
          Plaintiff-Claimant,           )
                                        )
     v.                                 )     No. 11-cv-7449
                                        )
                                        )     Jeffrey T. Gilbert
CAROLYN W. COLVIN, Acting               )     Magistrate Judge
Commissioner of Social Security,        )
                                        )
          Defendant-Respondent.         )

**MEMORANDUM OPINION AND ORDER**

**I. BACKGROUND**

Claimant Cecil E. Kruel ("Claimant") brings this action under 42 U.S.C. § 405(g),

seeking reversal or remand of the decision by Respondent Carolyn W. Colvin,[1] Acting

Commissioner of Social Security ("Commissioner"), in which the Commissioner denied

Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI"). This matter is before the Court on the parties' cross-motions for summary

judgment [Dkt.##28, 33]. Claimant argues that the decision of the Administrative Law Judge

("ALJ") denying his application for DIB and SSI should be reversed and/or the case should be

remanded for further proceedings. Claimant argues that the ALJ engaged in an improper

Residual Functional Capacity ("RFC") analysis with respect to Claimant's credibility and

obesity.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically substituted as the Defendant-Respondent in the case. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

For the reasons set forth below, Claimant's motion for summary judgment [Dkt.#28] is granted, and the Commissioner's motion [Dkt.#33] is denied. The decision of the Commissioner of Social Security is reversed, and this matter is remanded to the Social Security Administration for further proceedings consistent with the Court's Memorandum Opinion and Order.

**A.      Procedural History**

Claimant filed his application for DIB and SSI on March 24, 2008, alleging a disability onset date beginning September 19, 2005. R. 20. The Social Security Administration ("SSA") initially denied the applications on June 3, 2008 and upon reconsideration on August 22, 2008. *Id.* Thereafter, Claimant requested a hearing before an ALJ on September 26, 2008. *Id.* Claimant appeared with his attorney and testified at a hearing on April 22, 2010. *Id.* ALJ Jose Anglada presided over that hearing. Claimant and vocational expert Susan A. Entenberg testified in person. No medical testimony was heard. On August 3, 2010, the ALJ rendered a decision finding that Claimant was not disabled under the Social Security Act. R. 27. The ALJ found that Claimant had the residual functional capacity ("RFC") to lift and/or carry twenty pounds occasionally and ten pounds frequently; stand/walk about four hours in an eight hour workday; and sit about six hours, with normal rest periods. R. 24. The ALJ also found, based on the testimony of the vocational expert, that Claimant was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and therefore was "not disabled." R. 27.

Claimant appealed the ALJ's decision, which the Appeals Council upheld on July 19, 2011, rendering the ALJ's decision the final decision of the Commissioner. R. 7. On October 20, 2011, Claimant filed this action for review.

**B.     Hearing Testimony — April 22, 2010**

**1.  Cecil E. Kruel — Claimant**

At the time of the hearing, Claimant was forty-nine years old, separated from his wife, and homeless. *See* R. 35–37. He had adult children from that marriage, as well as another six-year-old child from a separate relationship for whom he owed back child support. *See* R. 37, 51, 52. Claimant completed high school and one year of college. R. 37. He last worked full-time eight or nine years before the hearing as a machinist. R.38. He also testified he "might" have worked in a part-time, temporary position after that. R. 38. He stopped working, he testified, when he was laid off from his last job. R.39. After he lost his job, Claimant collected unemployment benefits for six months and continued to try to find work. R. 39. Claimant testified that he stopped looking for work about five years before the hearing because he kept getting turned down, and he was dealing with pain. R. 39–40.

Claimant testified that he could not work because of pain in his hip. R. 45. He testified that he had surgery on his hip in August of 2008 after having "all kind of arthritis and pain." R. 41. Despite surgery, Claimant testified that his hip problems continued. He testified that he never had a day without pain, although it would come and go every other hour or every half hour. R. 58. Claimant's pain depended on whether he was standing, sitting, or moving the wrong way. *Id.* At the hearing, Claimant characterized his pain as a 7 or an 8 out of 10, with 10 being the worst. *Id.* He testified that he did not take painkillers because they were addicting to him. R. 45. Claimant's medical records show he had a history of substance abuse. R. 797, R. 847–48. Claimant testified at the hearing that he took medication for diabetes and high blood pressure. R. 44–45.

Regarding his capacity to work, Claimant testified that he could carry twenty or twenty-five pounds a half of a block. R. 53. He testified that he carried his clothing and personal belongs in two bags of an undefined weight everywhere he went. R. 53–54. Although it was difficult, he said he could pick things up off the ground (R. 56), but he could not consistently haul weight of twenty pounds back and forth. R. 59–60. Claimant additionally testified that he could stand for two hours at a time before becoming uncomfortable. R. 55. He could sit for about an hour or an hour and a half before needing to get up and move. R. 56. He testified that he was unable to walk more than two or three blocks. R. 55. If he had a job requiring sitting for a long period of time, such as a telemarketing job, Claimant said that he would need to stand up or even walk around to get comfortable. R. 58–59.

On a typical morning at the time of the hearing, Claimant testified that he woke up at a homeless shelter at 7:00 a.m. R. 46. He ate breakfast there at 8:00 a.m. R. 49. Claimant testified that he would then go to the library "almost every day" to read his Bible. R. 47. He testified that the library was about three or four miles from the shelter, and he would take the bus. R. 46. He testified that he also might go to the park or go to friends' homes. R. 49, 56. Claimant then would go back to the shelter and have another meal at 6:00 p.m. R. 49. In addition, he also went to church once or twice each month when he had someone to give him a ride or could pay to get there. R. 50. Claimant testified that he could not always afford a bus pass. R. 50. He received public assistance for food. R. 56–57.

### 2. Susan Entenberg — Vocational Expert

Susan Entenberg testified as a vocational expert ("VE"). R. 60. The VE described Claimant's past work experience as a machinist as a skilled job with medium work. R. 61.

The ALJ presented the VE with a hypothetical, asking whether a person with Claimant's age, education, and skill set—limited to lifting and carrying up to twenty pounds occasionally and ten pounds frequently; standing/walking about four hours during an eight-hour workday; sitting about six hours with normal rest periods; never working at heights; not frequently climbing ladders or stairs; and only occasionally stooping, kneeling, crouching, or crawling— would be able to perform Claimant's past work. R. 62. The VE indicated that, with those limitations, the hypothetical person would not be able to perform Claimant's past work. *Id.* Then the ALJ asked at what level of exertion a person of those limitations could function. *Id.* The VE responded that the person could do a full range of sedentary work. *Id.* The VE testified that the person could be an information clerk, piece assembler, or inspector. R. 62–63. There were about 8,000 of the first two positions and 3,000 of the last position available in the Chicago metropolitan area, according to the VE's estimates. *Id.*

For the next hypothetical, the ALJ assumed the same factors but increased the limitations such that the person could walk no more than three blocks at a time; stand no more than two hours at a time; and sit no more than an hour and a half at a time. R. 63. The VE responded that if such a person could stand for two hours at a time throughout the eight-hour day, then that person could work light jobs. *Id.* The ALJ said that the person would have to alternate between standing and sitting, and the VE indicated that would be feasible since there are generally breaks after two hours. *Id.* In addition, the VE testified that an ability to stand for a period of time would allow for such jobs as cashier or food preparation worker. R. 64. She estimated that there were 20,000 of both of these positions available in the Chicago metropolitan area. *Id.*

On cross-examination by Claimant's attorney, the VE testified that a person who needed to leave the immediate workspace vicinity frequently throughout the day to alleviate pain and

discomfort would not sustain the work activity. *Id.* The VE further testified that a person whose attention and concentration would render one off-task twenty percent of the workday or a person who would need four additional fifteen-minute breaks throughout the day on top of those standard breaks would similarly be unable to sustain the work activity. R. 65.

## C.      Medical Evidence

### 1.      Treating Physicians

Some time in the 1990s, Claimant dislocated his right hip. *See* R. 209, 421, 1113.  He apparently underwent surgery and recovered well until pain developed in his right groin. R. 213. Evidence in the record detailing Claimant's troubles stemming from his hip injury date back to 2005.

#### i.      2005

On October 12, 2005, Claimant complained of right hip pain at the Jesse Brown Veteran Affairs Medical Center ("Jesse Brown"). R. 422. He rated his pain at 10 out of 10 in severity. *Id.* Although Claimant was taking Naproxen at that time, it was "not helping." R. 421. The attending physician gave him Vicodin for more severe pain. R. 422. On Nov. 30, 2005, Claimant went to the emergency department at Mount Sinai Hospital, complaining of intense pain, difficulty walking, bending his right leg, and balancing. R. 457.  X-rays of Claimant's pelvis and right hip showed degenerative changes in the right hip joint, with narrowing of the joint space, spur formations, and bone sclerosis. R. 206.

Dr. Nishitkumar Patel then examined Claimant at Mount Sinai Hospital on December 22, 2005. R. 209. Dr. Patel reported that Claimant had "obvious painful range of motion with right hip rotation" and walked with a limp. *Id.*  While they discussed the possibility of total hip

replacement, Dr. Patel instead referred Claimant to physical therapy and advised him to lose some weight. *Id.*

### ii.    2007

The record is silent as to Claimant's progress or pain problems following his December 22, 2005 consult until September 13, 2007. On this date, Dr. Prahlad Pyati treated Claimant for "increasing pain" in his hip. R. 203. Claimant had gained weight since December 2005. *Id.* A physical examination showed Claimant "obviously" had a "stiff painful right hip." *Id.* X-rays further showed broken hardware securing a fixation plate in his right hip and "severe" degenerative changes in his right hip joint. R. 207. Nothing in the record indicates exactly when the hardware was placed in Claimant's hip.

Due to Claimant's recurring pain, he was again referred to Dr. Patel. R. 213. Dr. Patel examined Claimant on November 21, 2007. *Id.* Claimant told Dr. Patel that Claimant's pain was "severe" and "present almost on a daily basis." *Id.* The pain limited Claimant's ability to walk, maneuver stairs, kneel, squat, and gave him difficulty in reaching his shoes and socks on his right side. *Id.* Dr. Patel also observed that Claimant used a cane for walking and had an "antalgic limp"[2] on the right side. R. 212. Claimant's right hip range of motion was limited with pain. *Id.* X-rays showed changes suggestive of posttraumatic arthritis in the right hip with a deformed femoral head and obliterated joint space. R. 211. Dr. Patel wrote that it appeared that Claimant "reached a stage where his symptoms are severe and interfering with his activities of daily living." *Id.* As a result, Claimant seemed willing to undergo surgery rather than continue with nonsurgical treatment. *Id.*

---

[2] An antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures." *Available at* http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited April 19, 2013).

### iii.    2008

Roughly four months passed before Claimant was again treated at Jesse Brown. R. 381. He complained of blurry vision on March 12, 2008. *Id.* Two weeks following that event, Claimant again went to the emergency room, complaining of excessive thirst and urination, abdominal pain, blurry vision, lightheadedness, and generalized decreased strength. R. 381. He had lost thirty-two pounds in three weeks. *Id.* Claimant was admitted to Jesse Brown for four days, treated for, and diagnosed with diabetes. R. 200, 367. Upon discharge, Claimant was instructed to attend diabetes education and weight management classes. R. 200. An eye exam the following month suggested that Claimant's large refractive change was due to uncontrolled blood sugar. R. 501.

Claimant's troubles with his hip also persisted. On May 12, 2008, kinesiotherapist Ann Pressley evaluated Claimant and issued him a cane. R. 236, 254–55. Claimant also indicated to another physician that he wanted to proceed with arthroplasty, as his symptoms were "not responsive to conservative measures." R. 255. The hospital's schedule delayed the procedure for the summer. *Id.*

In July 2008, Claimant again sought to schedule surgery for his hip. R. 853. Claimant complained of worsening pain at 8 out of 10, was unable to tie his shoes, and used his cane. R. 852, 853. Claimant's July 22, 2008 preoperative assessment reported that Claimant could walk only one block due to his right hip pain. R. 848. He suffered from arthritis, chronic low back pain, and right hip pain. *Id.*  Claimant was additionally listed as obese. *Id.*, R. 849.

On August 1, 2008, Claimant received a lumbar selective nerve root injection and nerve block to decrease the swelling and pain in his right hip. R. 806. Surgeons also performed a right total hip arthroplasty that day. R. 858. Following surgery, a notation shows that Claimant had

limited mobility, unsteady gait, and was at a high risk of falling. R. 782–83. A notation from August 2, 2008 further indicates that Claimant received information about obesity risks, as his body mass index was greater than 25. R. 789.

Claimant's problems with mobility and his high risk of falling were again charted over the next several days. *See* R. 716, 881, 887–88, 996–97. Claimant used a cane at home and reported being able to walk half a block without pain on August 4, 2008. R. 769. He reported using a wheelchair on August 6, 2008 (R. 1382) and used a rolling walker in therapy on August 7, 2008. R. 889. Over the same period, Claimant reported stiffness while walking and needing assistance for bathing and dressing. *See* R. 885, 934. He received adaptive equipment such as a raised toilet seat, sponge, and dressing stick on August 4, 2008. R. 982.

Claimant's pain also reportedly continued. On August 5, 2008, he reported pain at 7 out of 10, with 2 as an acceptable level of pain. R. 704-05, 925. Claimant said the pain made him unable to concentrate. R. 705, 925. Claimant made a similar report on August 16, 2008, rating his hip pain at 7 out of 10 and decreased to 5 with Vicodin. R. 1228.

On September 5, 2008, Claimant went to the emergency room complaining of right hip pain. R. 1184. The pain in his right groin worsened when he moved into certain positions and walked. *Id.* The physician noted that Claimant was "running out of Vicodin" and had decreased from four to two pills daily the day before his pain developed. *Id.* X-rays revealed one of the fixing screws in his hip from his previous surgery was still broken. R. 1186; *see also* R. 1192. Notes from a physical medicine rehab consult on September 29, 2008 indicate that Claimant had no hip pain and could walk a block with a cane. R. 1179, 1180. As of December 29, 2008, Claimant's treating physician noted that Claimant still ambulated with a cane and reported that he still had mild right hip "stiffness" and occasional mild pain. R. 1175.

### iv.    2009

Medical records from 2009 show that Claimant struggled to manage his diabetes and substance abuse. Claimant went to the emergency room on June 15, 2009, five days after becoming homeless, with elevated blood sugars, blurry vision, and dry mouth. R. 1167. An August 24, 2009 note also shows that Claimant was noncompliant with his diabetes and needed his insulin increased despite the fact that it was increased the previous month. R. 1129. The treating physician discussed the health risks of obesity and benefits of weight loss with Claimant, but he declined referral to weight loss programs. R. 1130. In September 2009, Claimant again went to the emergency room for hyperglycemia. R. 1125. Claimant's physician increased Claimant's insulin and discussed the importance of diabetic control and regular follow-up on December 7, 2009. R. 1118.

Claimant also sought treatment for substance abuse on July 1, 2009. R. 1147–48. Claimant reported using cocaine two weeks prior as a result of becoming homeless after abstaining for about eight months. *Id.* Before that, he had been clean for six years after a twenty-five year history of substance use. *Id.* Claimant also noted a prior history of alcohol abuse. R. 1153. Subsequent notes in the record show that Claimant attended both individual and group addiction treatment meetings. R. 1123–24, 1127–28, 1131–32. He consulted with a nurse practitioner on August 24, 2009 after being referred from the homeless program, and Claimant reported no pain. R. 1130.

On October 13, 2009, Claimant's addiction therapist noted that Claimant reported attending weekly meetings "and is actively engaged with his church." R. 1122. The therapist continued that Claimant "stated he is helping the pastor of his church with numerous religious related tasks, adding the pastor is his sponsor/mentor, and he is still residing at the church. . . .

Patient appears to be doing well and has developed a motivation for continued long-term recovery." *Id.*

### v. 2010

Addiction psychiatry progress notes from February 22, 2010 indicate that an addiction therapist spoke with Claimant on his cell phone. R. 1396. Claimant said he was abstaining from drug use, living in his own apartment, and attending 12-Step support meetings. *Id.* The therapist noted that Claimant "continues active involvement with and helping the pastor of his church." *Id.* The therapist also noted that Claimant "added that everything is going well" and that he would contact the therapist if that should change. *Id.* The therapist concluded, "Patient is being discharged from ATP [Addiction Treatment Program] with a prognosis of good." *Id.*

### 2. State Agency Examinations

### i. Dr. Jimenez

On May 23, 2008, roughly two months before Claimant's hip replacement surgery, Dr. Frank Jimenez filled out a RFC assessment for Claimant. R. 465. Dr. Jimenez, a state agency consultant, checked boxes indicating that Claimant occasionally could lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; and stand and/or walk with normal breaks for only at least two hours in an eight-hour workday. R. 459. He further checked boxes finding that Claimant only could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. R. 460. Dr. Jimenez noted that he did not have statements from a treating physician regarding Claimant's physical capacities. R. 464. Claimant's current exam, however, according to Dr. Jimenez's notation, "reveal[ed] antalgic gait with use of a prescribed cane for ambulation." R. 460. Dr. Jimenez also noted that Claimant had decreased rotation of motion in his right hip with increasing pain. *Id.*

11

### ii.   Dr. Wabner

On August 21, 2008, three weeks after Claimant's hip replacement surgery, Dr. Charles Wabner completed an RFC assessment. R. 875. Dr. Wabner, another state agency examiner, checked boxes indicating that Claimant occasionally could lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; and stand and/or walk with normal breaks for about six hours in an eight-hour workday. R. 869. He further checked boxes indicating Claimant could climb ramps or stairs and balance frequently, while he could only occasionally stoop, kneel, crouch, or crawl. R. 870. Dr. Wabner, like Dr. Jimenez, noted that Claimant's file did not include a treating physician's statement regarding Claimant's physical capabilities on which Dr. Wabner could rely. R. 874. He also noted that Claimant was expected to make a "full recovery," including the ability to perform "a full range of light work activities," within one year of surgery. R. 869. At that time, Dr. Wabner noted that Claimant was ambulating with a walker. *Id.* Nothing in the record indicates that Dr. Wabner examined Claimant again.

### D.   The ALJ'S Decision

After a hearing and a review of the medical evidence, the ALJ determined that, from September 19, 2005 through the date of his decision, Claimant was not disabled as defined by the Social Security Act. R. 20. The ALJ reviewed Claimant's application under the required five-step sequential evaluation process. R. 21–22. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since September 19, 2005, the alleged onset date. R. 22. At step two, the ALJ found that Claimant had the severe impairments of arthritis, status post right hip replacement, and diabetes mellitus. *Id.* The ALJ did not find that Claimant had the severe impairment of obesity.

Then at step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404.1520(d). *Id.* Regarding Claimant's right hip, the ALJ determined that it did not fall within the impairment requirements for mayor dysfunction of a joint because Claimant "has had a successful recovery" and "is now able to ambulate effectively, as shown by [sic] the medical records and as evidenced by his activities of daily living." R. 23. The ALJ in part relied on an occupational therapist's progress notes from August 14, 2008, indicating that Claimant "was anticipated to have a full physical recovery." *Id.* (citation omitted). The ALJ further ruled out diabetes mellitus as falling within the scope of C.F.R. 404.1520(d) on the basis that it did not have the effects on Claimant as the listing required. R. 22. The ALJ also determined that Claimant was also able to control his diagnosis with medications. *See id.*, R. 24.

Next at step four, the ALJ then found that Claimant had an RFC to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). R. 24. The ALJ noted that Claimant was unable to work at heights, frequently climb ladders or stairs, and could only occasionally stoop, kneel, crouch, or crawl. *Id.* But the ALJ also noted that Claimant could lift/carry twenty pounds occasionally and ten pounds frequently; stand/walk for about four hours in an eight-hour workday; and sit about six hours, with normal rest periods. *Id.*

In making that RFC determination, the ALJ wrote that he considered Claimant's symptoms to the extent that they could reasonably be accepted as consistent with the objective medical evidence and other evidence as required by 20 C.F.R. 404.1529. *Id.* The ALJ also wrote that he considered the opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527. Because Claimant's statements about the intensity, persistence, and functionally limiting effects of pain and other systems were not substantiated by objective medical evidence,

the ALJ indicated that he was required to consider the entire case record to make a finding as to the credibility of those statements. R. 25.

Insofar as evidence was available in the record, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms but found that Claimant's statements concerning those symptoms were "not credible." *Id.* Regarding Claimant's alleged pain, the ALJ wrote that Claimant "first testified that it comes and goes and later stated he is in constant pain." *Id.* The ALJ further wrote that "there is no indication in the record that claimant has required pain medication since shortly after hip surgery," which he determined to have been "evidently successful, based on the medical records." *Id.* The ALJ then highlighted that as of August 8, 2008, the occupational therapist reported Claimant had met his functional occupational therapy goals and progress notes from the following week indicated Claimant was "anticipated to have a full recovery." *Id.* The ALJ stated: "Claimant has not required additional treatment for his hip since his recovery from the surgery, which required only the standard physical and occupational therapy." R. 25. Further, the ALJ noted that Claimant's diabetes was controlled with medication, and he was "actively involved with and helping the pastor of his church." *Id.*

Regarding the medical opinion evidence, the ALJ agreed with the state agency's medical consultant opinion from August 21, 2008 that Claimant could perform light work, which was consistent with the RFC the ALJ had determined. R. 25. The ALJ also wrote that Claimant's physician had noted in the month following his surgery that Claimant was expected to be out of work for six to twelve months. *Id.* The ALJ then highlighted that agency regulations condition a finding of disability on being unable to engage in substantial gainful activity for no less than twelve months. R. 25–26.

14

Finally, at step five, the ALJ concluded that Claimant was unable to perform any past relevant work but found there were jobs in the national economy that Claimant could perform. R. 26. Thus, the ALJ concluded that Claimant was not disabled under the Social Security Act. R. 27.

## II. LEGAL STANDARD

### A. Standard of Review

Factual findings of the Commissioner of Social Security, "if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Counsel denies a request for review. 20 C.F.R. § 404.981; *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court reviews the ALJ's decision. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a hearing. 42 U.S.C. § 405(g).

**B. Disability Standard**

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot—considering his age, education, and work experience—partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is used in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant

16

can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 883, 841 (7th Cir. 2007).

### III. DISCUSSION

Claimant argues that the ALJ engaged in an improper RFC analysis by wrongly discounting Claimant's credibility and failing to consider his obesity.  Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the credibility of the claimant's testimony based on the entire case record. Social Security Ruling ("SSR") 96–7p; *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). Because pain affects people differently, allegations of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).

The ALJ is in the best position to determine a witness's truthfulness, so this Court will not overturn an ALJ's credibility determination unless it is patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). The ALJ has the discretion to discount testimony on the basis of evidence in the record. *Johnson v. Barnhart*, 449 F.3d 431, 435–36 (7th Cir. 2000). However, the basis for the ALJ's credibility determination must be articulated and "sufficiently specific" to make clear to a claimant and subsequent reviewers the weight given to a claimant's statements and the reasons for the weight given. SSR 96–7p. The ALJ must consider the entire case record in determining credibility, and statements about intensity or persistence of symptoms or about the effect of

17

symptoms on functioning may not be rejected simply because they are not substantiated by objective medical evidence. *Id.*

Claimant argues here that the ALJ made an improper credibility determination, in part, because the ALJ used "meaningless" boilerplate language, which has been "time and time again criticized by the Seventh Circuit." Pl.'s Mem. Supp. Mot. Summ. J. at 9. While Claimant correctly identifies that boilerplate language may be cause for concern, *see Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), the inclusion of such language can also be harmless error where the ALJ offers other reasons grounded in the evidence, *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). Because the ALJ in this case provided reasons for his determination, this Court proceeds, like the Court in *Filus*, to examine them.

### A. The ALJ's Reasons for Dismissing Claimant's Credibility in Connection with Claimant's RFC Analysis Were Patently Wrong.

The Court finds that the ALJ's reasons for discounting Claimant's credibility are patently wrong in light of the entire case record for two reasons. First, the ALJ found Claimant's testimony to be inconsistent, determining that "although he first testified that [pain] comes and goes, he stated he is in constant pain." R. 25. Claimant's testimony shows, however, that the ALJ was wrong. Claimant testified consistently that he is in pain every day but that the pain comes and goes depending upon his movement. *See* R. 45, 55–56, 58.

Several parts of Claimant's testimony illustrate this point. When the ALJ's asked why Claimant thought he could not work at the time of the hearing, Claimant testified:

> I have pain all the time. I sit down too long; I got pain. I get up and walk around; I have pain. My legs, if I turn a certain way, they lock up. The hip lock up and then I have to do some wiggling for a few minutes . . . and it's just ongoing.

R. 45. Claimant's responses to more specific questions also support such a description. The ALJ asked Claimant how long he could stand in place. R. 55. Claimant responded that if he stood

"more than two hours, I got pain the rest of the day until I rest and then that's just it." *Id.* The

ALJ then asked Claimant how well he could sit. *Id.* Claimant testified that he had been sitting

during the hearing, and "the pain kick in and then locks up so I have to get up and move around

or I have to wiggle it." R. 55–56. When the ALJ later asked whether Claimant's pain was

constant, Claimant again answered consistently. He testified, "The pain comes and goes but it

comes and goes. . . . Depends on if I'm standing or if I'm moving the wrong way, moving the

right way. I just be cautious but the pain is always there." R. 58. Moreover, the ALJ specifically

asked Claimant, "Was there ever a day where you were pain free?" *Id.* Claimant answered, "No,

there wasn't." *Id.*

This testimony shows that Claimant was consistent in testifying that his pain existed

every day but the pain came and went throughout the day depending on his movement. The

ALJ's conclusion that Claimant "first testified that [pain] comes and goes and later stated he is in

constant pain" instead focuses on select phrases in Claimant's testimony. A complete reading of

Claimant's testimony therefore proves the ALJ's determination that Claimant testified

inconsistently to be unfounded.

Second, the ALJ's finding that "there is no indication in the record that claimant has

*required* pain medication since shortly after his hip surgery" similarly is wrong. R. 25 (emphasis

added). Claimant testified on three occasions during his hearing that he declined pain

medication, not because he did not require it, but because it was addicting to him. *See* R. 43, 45.

When the ALJ asked Claimant if he returned to Jesse Brown after his surgery for follow-up

treatment, Claimant testified, "I had pain and they just want to give me painkillers. I cannot take

painkillers, you know." R. 43. Later, the ALJ asked Claimant about his medications and whether

he was being treated for anything else. R. 45. Claimant testified, "[T]hey want to give me

painkillers but I denied the painkillers because it's addicting." *Id*. The ALJ then asked Claimant if he did not want painkillers. *Id.* Claimant explained, "I have to go without them because it's addicting to me." *Id*.

Whether a claimant requires pain medication can shed light on the credibility of his statements about his symptoms. SSR 96-7p. But an ALJ may not draw any inferences from a claimant's failure to take medications without first considering the explanations that a claimant may provide. *Id.*; *see also Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *Myles*, 582 F.3d at 677; *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). For example, a claimant's explanation that the side effects of prescription medication are less tolerable than his symptoms or that medical treatment may be contrary to his religion provide insight into his credibility. SSR 96-7p.

The ALJ here drew a negative inference regarding Claimant's credibility from the fact that he did not require pain medication since shortly after his surgery and did not consider Claimant's explanation. Claimant testified and the record confirmed, however, that Claimant struggled with addiction. The record showed that in 2009 Claimant had a relapse with cocaine. R. 1147–48. The ALJ did not address this point. Even though the ALJ's opinion elsewhere refers to Claimant's efforts to seek treatment for addiction (R. 24), the ALJ did not properly explore Claimant's explanation for refusing pain medication in reaching his conclusion that Claimant did not require pain medication and was therefore less credible.

Accordingly, the Court finds enough error with these parts of the ALJ's credibility determination of his RFC analysis to remand the matter to the agency for further review. Claimant's remaining arguments regarding credibility, however, are addressed below to illustrate additional flaws that should then be addressed on remand.

20

**B. The ALJ Did Not Support With Substantial Evidence How Claimant's Daily Activities Discount His Credibility.**

To the extent the ALJ used Claimant's activities of daily life to discount his credibility for being inconsistent, doing so was improper without further developing the record. The ALJ noted, without elaboration, that "claimant is actively involved with and helping the pastor of his church." R. 25. The ALJ culls this piece of evidence from a February 22, 2010 note written by Claimant's addiction therapist. R. 1396. But the record contains no clearer indication of what "actively involved with and helping the pastor" means. The record does not describe the type of activities in which Claimant was involved or the nature of help he provided. Claimant testified that he went to church only once or twice a month. R. 50. The ALJ failed to probe the matter further. It is thus possible that being "actively involved with and helping the pastor," in effect, means nothing more than going to church once or twice a month.

In finding Claimant's daily activities to be inconsistent with the RFC assessment, the ALJ additionally failed to consider the potential differences between helping the pastor and Claimant's ability to complete a full workweek. An ALJ can consider a claimant's daily activities when assessing his alleged symptoms, 20 C.F.R. § 404.1529(a), but the ALJ must also consider the differences between those activities and the ability to work eight hours a day five consecutive days of the week. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). The ALJ cannot ignore a claimant's qualifications as to how his daily activities are carried out. *See Craft*, 539 F.3d at 680. Such consideration and analysis is important, because limited daily activities do not necessarily contradict a claim of disabling pain. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2001). Without evidence regarding the nature of Claimant's involvement with and helping the pastor, this Court

21

cannot find such activities to be inconsistent with Claimant's allegations of pain or testimony. The ALJ's cursory conclusion for discounting Claimant's credibility is improper.

### C. The ALJ Did Not Consider The Impact of Claimant's Obesity.

Claimant further argues that the ALJ failed to properly account for Claimant's obesity in assessing whether his pain allegations were credible. As a preliminary matter, the Commissioner failed to respond to Claimant's argument regarding obesity in her response brief. Had the Court not disposed of the case on the grounds discussed above, it could find that Commissioner conceded this argument. But because the Court is illustrating issues for consideration on remand, it proceeds to the obesity analysis.

Agency regulations provide in SSR 02-1p that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." Failing to acknowledge this effect may impact the ALJ's credibility determination. *Villano*, 556 F.3d at 562 (citing *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005)). The Seventh Circuit illustrated its point for one claimant with severe knee problems in *Martinez v. Astrue*, stating that it is one thing to have a bad knee but another to have a bad knee supporting a person with obesity. 630 F.3d 693, 698 (7th Cir. 2011).

The same could be said of Claimant's hip in the present case. As of April 24, 2008, Claimant was five-foot, nine-inches tall and weighed 244 pounds, representing a body mass index of 36, into the range of obesity, which is 30 or greater. *See* Pl.'s Mem. Supp. Mot. Summ. J. at 13; NIH, National Heart Lung and Blood Institute, http://www.nhlbisupport.com/bmi/. Although both the medical record and the ALJ's opinion describe Claimant's weight (R. 24), the

ALJ failed to analyze what effect it had on his hip under SSR 02-1p. An ALJ's failure to discuss the impact of Claimant's obesity on his overall condition can be reversible error when the record contains numerous references to a claimant's excessive weight problem, even if the individual does not claim obesity as an impairment. *See Clifford*, 227 F.3d at 873. The record in the present case refers repeatedly to Claimant's weight problem. *See, e.g.*, R. 209 (noting that Dr. Patel advised Claimant to lose some weight); R. 789 (noting Claimant received information about obesity risks, as his body mass index was greater than 25); R. 1267 (noting Claimant had a BMI of 36.7 on August 13, 2008). As a result, neither the ALJ nor the Commissioner can ignore the issue. The potential impact of Claimant's obesity should be considered on remand.

### IV. CONCLUSION

Claimant raises other arguments as to why the ALJ's RFC analysis was additionally flawed. The Court recognizes, however, that a proper credibility determination could inform a modified RFC finding on remand. Further speculation is thus unwarranted at this time.

For the reasons set forth above, the Court grants Claimant Cecil E. Kruel's motion for summary judgment [Dkt.#28], denies the Commissioner's cross-motion for summary judgment [Dkt.#33], and remands the case for further proceedings consistent with this opinion. This is a final and appealable order.

It is so ordered.

_____

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: May 22, 2013

23